## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

YITZCHOK LEBOVITS and
CHANA SHAPIRO-LEBOVITS, on
their own behalf and on behalf of their
daughters E.L., a minor, and A.L., a
minor; and
BAIS YAAKOV ATERES MIRIAM, a
New York religious corporation,

       *Plaintiffs,*

  v.

ANDREW M. CUOMO, individually
and in his official capacity as Governor
of the State of New York;
BILL DE BLASIO, individually and in
his official capacity as Mayor of the
City of New York;
LETITIA JAMES, in her official capac-
ity as Attorney General of the State of
New York;
HOWARD A. ZUCKER, in his official
capacity as Commissioner of the New
York State Department of Health;
CITY OF NEW YORK; and
NEW YORK CITY DEPARTMENT OF
HEALTH AND MENTAL HYGIENE,

       *Defendants.*

Civil No. <u>1:20-CV-1284</u> (GLS/DJS)


**COMPLAINT**


**JURY TRIAL DEMANDED**

### NATURE OF THE CASE

1.    This case concerns whether the Bais Yaakov Ateres Miriam (BYAM) school for Jewish girls can re-open for in-person instruction as planned on Tuesday, October 27, despite government orders forbidding such instruction, at least in certain neighborhoods.

1

2. For over 100 years, Orthodox Jewish girls have been learning and practicing their faith in Bais Yaakov schools. And for almost as long, the United States Supreme Court has recognized that the Constitution protects the "fundamental right" of parents like Plaintiffs Yitzchok and Chana Lebovits to direct their daughters' religious education. That is as it should be, particularly in a country to which so many Jews came to escape persecution and to preserve the freedom to raise and educate children in their own faith.

3. In a different case, a court might be asked to ascertain the point at which this fundamental right must yield to a government's claim that in-person education poses a public health risk. Indeed, this Court already considered the public health claim once in *Soos v. Cuomo*, ___ F. Supp. 3d ___, 2020 WL 3488742 (N.D.N.Y. June 26, 2020), enjoining Governor Cuomo's and Mayor de Blasio's efforts to apply an indoor capacity limitation only on houses of worship.

4. But this case is even easier, because here the Governor himself openly admits that COVID-19 is "not being spread by schools," and the Mayor agrees that there has been "very little coronavirus activity" in schools. And BYAM is particularly safe, both because it follows rigorous protocols—resulting in *zero* known cases to date in the school—and because it plans to test *all* students and staff before returning to school on October 27.

5. Nor can the government claim that the targeted Jewish neighborhoods have particularly high levels of COVID-19. To the contrary, Governor Cuomo recently stated that the COVID-19 levels at issue are quite low ("To other states that's nothing"). Indeed, across the entire country, there is *not a single other state* whose protocols require school closures for the COVID-19 levels that have been used to justify the current shutdown.

6. So if neither the inherent danger of school nor a particularly high COVID-19 rate explains the school closure, what does? The evidence admits of only two other

explanations. One answer is religious targeting of the Orthodox, a charge the government actually admits.

7.   The other answer is fear. As Governor Cuomo recently stated, these closures are not driven by public health, but by "fear" of people "losing confidence" in the City and "moving out." In response, the government adopted what Governor Cuomo called a "fear-driven" response that he acknowledges is a "very blunt" policy, "cut by a hatchet," which "is not the best way to do it," but which someday might give way to "a smarter, more tailored policy."

8.   But fear is not a compelling government interest, and—even in a pandemic—constitutional rights deserve better than a hatchet job. That is particularly true where the government admits public health is not in jeopardy.

9.   BYAM and its families have a fundamental right to continue their education in the proven safety of their school, and the government has no valid reason to prevent their return to that safe environment.

10.   Accordingly, a temporary restraining order must issue allowing the girls of BYAM to return to their safe school by October 27, and preliminary and permanent injunctive relief and damages should issue thereafter for Defendants' illegal closure orders.

## PARTIES

11.   Plaintiffs Yitzchok Lebovits and Chana Shapiro-Lebovits are devout Orthodox Jews and residents of Inwood, New York. Their daughters E.L. and A.L. are enrolled at Plaintiff Bais Yaakov Ateres Miriam, but are currently forbidden from attending school because of Defendants' actions. The Lebovitses are suing in their own right and on behalf of their daughters E.L. and A.L.

12.   Plaintiff Bais Yaakov Ateres Miriam (BYAM) is a New York religious corporation organized under Article 10 of the New York Religious Corporations Law that

operates a religious school for Orthodox Jewish girls located in Far Rockaway, New York.

13.  Defendant Andrew M. Cuomo is the Governor of New York. Governor Cuomo is domiciled in Albany. On October 6 and 14, 2020, Governor Cuomo issued executive orders requiring schools in certain Orthodox Jewish neighborhoods—including BYAM's—to close indefinitely, on pain of fines of $15,000 per day and loss of state funding. He is sued here in both his official and individual capacities.

14.  Defendant Bill de Blasio is the Mayor of New York City. Mayor de Blasio oversees the City agencies responsible for implementing and enforcing Governor Cuomo's orders described in ¶ 4. He is sued here in both his official and individual capacities.

15.  Defendant Letitia James is the Attorney General of the State of New York. James is responsible for enforcing the laws of the State of New York, including the orders at issue here. She is sued in her official capacity.

16.  Defendant Dr. Howard A. Zucker is the Commissioner of the New York State Department of Health, which is the agency responsible under Governor Cuomo's orders for determining which areas in the State would be subject to the orders' restrictions. Dr. Zucker is sued in his official capacity.

17.  Defendant City of New York has taken action to limit Plaintiffs' religious exercise.

18.  Defendant New York City Department of Health and Mental Hygiene is responsible under the Governor's orders for implementing the closure of schools, including BYAM.

## JURISDICTION AND VENUE

19.  This action arises under the Constitution and laws of the United States. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

20.   This Court has general personal jurisdiction over Defendants because they are domiciled in the State. The Court also has specific personal jurisdiction over Defendants because this case arises exclusively from their deliberate, continuous, and substantial contacts within the State.

21.   The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202.

22.   The Court also has the authority to issue injunctive relief against the Defendants under 42 U.S.C. § 1983.

23.   Venue lies in this district pursuant to 28 U.S.C. § 1391(b). A number of Defendants reside in this district, and all Defendants are residents of New York, the State in which this district is located. *Id.* § 1391(b)(1). Additionally, a substantial part of the events or omissions giving rise to the claims occurred in this district. *Id.* § 1391(b)(2).

## FACTUAL ALLEGATIONS

### A. Plaintiffs

#### 1. BYAM

24.   BYAM is affiliated with Bais Yaakov (sometimes also known as "Beys Yankev"), a global movement of Orthodox schools for Jewish girls.

25.   The first Bais Yaakov school was founded by Sara Schenirer in Krakow, Poland, in 1917. At the time, in many Orthodox communities, girls received their education only in the home—outside of school, and away from their peers and their rabbis. Orthodox Jewish boys were then (as today) educated at yeshivas, but many Orthodox girls "received no formal Jewish education." Asaf Kaniel, *Beys Yankev*, The Yivo Encyclopedia of Jews in Eastern Europe, https://perma.cc/4DVN-G2V4 (Kaniel, *Beys Yankev*).

26.   The Bais Yaakov movement revolutionized how Jewish girls were educated around the globe. In Bais Yaakov schools, Jewish girls receive a rigorous education

in both religious and secular studies. *See id.; see also The Bais Yaakov Movement*, The Bais Yaakov Project, https://perma.cc/X68B-JYL9.

27.    Under Sarah Schenirer's charismatic leadership, Bais Yaakov schools spread throughout Europe, educating tens of thousands of Jewish women. Deborah Weissman and Lauren B. Granite, *Bais Ya'akov Schools*, The Encyclopedia of Jewish Women, https://perma.cc/8TZB-F577 (Weissman & Granite, *Bais Ya'akov*).

28.    Because work outside the home was often an economic necessity for Orthodox women in pre-World War II Europe, Bais Yaakov schools also offered professional training in bookkeeping, nursing and education. *See id.*

29.    The schools spread to the U.S. and Israel in the late 1930s, where they continued Sarah Schenirer's vision of nurturing Jewish girls' commitment to their religious and cultural heritage by educating them outside the home, in community with their peers, and with the religious leadership of their rabbis. *See id.*

30.    The Bais Yaakov movement survived the Holocaust and helped Jewish girls restore the Jewish faith in the years afterward.

31.    BYAM itself was founded in 2012 by Rabbi Nathan (Nosson) Neuman.

32.    BYAM began as a preschool with only 31 students. In less than a decade, it has grown to more than 300 students from nursery school through 8th Grade.

33.    In that short time, BYAM has developed a reputation in the community as a place of academic, emotional, and spiritual growth for students and their families.

**2.  The Lebovits Family**

34.    Chana Mindy Shapiro-Lebovits and Yitzchok Lebovits are Orthodox Jews who live in Inwood, Nassau County, New York. The Lebovitses have three daughters: E.L., A.L., and Baby L. E.L. and A.L. attend BYAM. E.L. is in third grade and A.L. is in kindergarten.

35.   Both of the Lebovitses work full time. Mindy Lebovits works at an interior design boutique and Yitzchok Lebovits is a speech pathologist who works with children and the elderly.

36.   The Lebovitses live about 10 minutes from BYAM. They chose this location in part because of how close it was to the school.

37.   The Lebovitses chose BYAM for their daughters because they wanted to ensure that their daughters had the foundation they needed to continue to learn about their faith throughout their life, as Orthodox Judaism requires.

38.   In particular, the Lebovitses wanted their daughters to be able to learn to speak and write Hebrew, which is extremely important to the practice of their faith. Because the Lebovitses are not fluent in Hebrew, this is not something that they can teach effectively at home.

39.   During their time at BYAM, the Lebovitses have seen E.L. and A.L. grow in their Orthodox Jewish faith. For example, BYAM uses songs and dances to teach E.L. and A.L. Hebrew prayers that are essential to the practice of their Orthodox Jewish faith. The Lebovitses have observed that the music BYAM uses "brings prayer to life." These prayers, some of which must be performed in a group setting, cannot be taught as effectively at home.

40.   As a result of Defendants' actions, E.L. and A.L. have lost time learning, praying, singing, and growing in their Jewish faith with other students.

41.   As a result of Defendants' actions, the Lebovitses have incurred additional costs for, among other things, hiring babysitters for their daughters while they are at work.

### 3. Plaintiffs' Religious Beliefs

42.   In-person education is critical to Plaintiffs' Orthodox Jewish faith.

43.   Plaintiffs believe that the study and implementation of Torah constitutes the ultimate religious experience for Jewish youth, and that practice is at the heart of a

BYAM education. The Talmud teaches that Torah study is acquired only in a group setting. *See Talmud Bavli, Berakhot 62b.*

44.    Plaintiffs likewise believe that Torah study can be most fully experienced face-to-face, from teacher to pupil or between colleagues. This belief traces back to the book of Exodus, which explains that when Moses received the Torah from God, to be handed down to his and future generations of Jewish students, "God would speak to Moses face to face, as a man speaks to his friend." *Exodus* 33:11.

45.    Prayer is also a central part of BYAM's religious mission. Every school day begins with extensive communal prayer, which both fulfills a religious obligation for prayer and also sets the tone for the entire day's activities. For example, in their daily prayers, girls at BYAM recite the passage of Elu Devarim, devoting themselves to good deeds including acts of kindness, helping the sick, feeding the hungry, honoring the deceased, promoting peace, and studying the Torah. *See* Nosson Scherman, *The Complete Artscroll Siddur* 16-17 (New York: Mesorah Publications, 1990).

46.    Plaintiffs believe it is critical for prayers like these to be said communally and in-person. As the Talmud teaches, Hashem (G-d) does not turn away from the prayer of the masses, said in unison. The Talmud also teaches that Jews should assemble in groups for prayers and rituals, as, per Proverbs 14:28, "In the multitude of people is the king's glory." *See Talmud Bavli, Berakhot 8a and b; Talmud Yoma 70a.*

47.    Further, learning to read Hebrew is vital for reciting Orthodox Jewish prayers and blessings, as well as for reading the Hebrew Bible, which is done in the original. Hebrew instruction is not easily teachable through remote means. Moreover, Hebrew instruction itself is ritualized in a manner that can only be realized in in-person groups.

48.    For example, for centuries, Jews have accompanied the learning of the *Aleph Bais*—the Hebrew alphabet—with celebrations complete with the baking and eating

of special foods. In keeping with this tradition, BYAM teaches students to bake cookies in the shape of Hebrew letters. This cannot be done remotely. *See* Ephraim Kanarfogel, *Jewish Education and Society in the High Middle Ages* (1992).

49.  Education at BYAM also includes many other rites of passages and rituals that cannot be replicated online.

50.  For example, at a "*siddur* party," students are handed their first prayer book (*siddur*). Mailing a siddur would not achieve the same purpose of instilling love and dedication through personal connection and celebration. A rabbi inscribes each girl's name in her *siddur*, in a moving ceremony that instills love and excitement for Judaism.

51.  Similarly, BYAM conveys the ethical teachings of its faith not just through instruction but through practice and social interaction. For example, students often work together to draw get-well cards for the sick, or create art projects to send to old-age homes.

52.  BYAM also celebrates Jewish holidays in a way that must be conducted in-person. In the month leading up to Rosh Hashana, for example, rabbis blow a *shofar* (ram's horn) as part of an important Jewish ritual. A *shofar* blast's impact cannot be conveyed through virtual means.

53.  Likewise, beginning with the month in which the Jewish holiday of Purim occurs, there is a religious obligation to rejoice, which BYAM carries on with traditions such as costume-wearing, plays, music, and a carnival. These activities cannot be realized remotely. Orthodox Union, *The Month of Adar*, https://perma.cc/BC8J-2ETB.

54.  Religious music is also a central component of Jewish education at BYAM. Our students learn, write, and sing religious songs, pray with song, and even study biblical scripture with chanting. Group singing and musical instruction cannot be done in an effective manner remotely.

55.   In short, Orthodox Jewish education cannot be fully replicated by telelearning, threatening the vitality of Plaintiffs' traditions and the religious messages they convey in the lives of students.

**B. The State's July Guidance for Reopening BYAM**

56.   As the COVID-19 pandemic hit New York in March 2020, BYAM willingly moved to remote instruction for the remainder of the school year out of a religious and ethical concern to protect their neighbors and comply with the law.

57.   BYAM spent approximately $12,000 to equip the school with wifi and to purchase additional laptops and tablets for students and teachers to use for remote instruction.

58.   Nevertheless, BYAM faculty and staff witnessed that students were simply unable to learn effectively via remote instruction.

59.   In particular, without in-person instruction, student retention and knowledge of religious material—including students' ability to recite the Hebrew alphabet and intricate prayers—regressed.

60.   On July 27, 2020, following BYAM's decision to cease in-person religious schooling in compliance with the State's protocols, the State emailed BYAM with reopening guidance.

61.   In an attached document entitled *New York State Reopening Guidance for Religious and Independent Schools*, the State explained that religious schools must submit reopening plans in "accordance [with] the guidance released by DOH."

62.   That DOH guidance was  entitled *Interim Guidance for In-Person Instruction at Pre-K to Grade 12 Schools during the COVID-19 Public Health Emergency* (the "Interim COVID-19 Guidance for Schools") and made available at https://perma.cc/V7LX-K55T.

63.   The Interim COVID-19 Guidance for Schools governed "all types of public and private (both secular and non-secular) elementary (including pre-kindergarten),

middle, and high schools"; required "school districts, boards of cooperative educational services (BOCES), charter schools, and private schools" to "develop individual plans for reopening and operating during the COVID-19 public health emergency"; and explained that "[e]ach [reopening] plan must meet the minimum standards set forth in this guidance."

64.   Specifically, reopening plans had to cover and include guidelines for (1) reopening of school facilities for in-person instruction, (2) monitoring of health conditions, (3) containment of potential transmission of COVID-19, and (4) closure of school facilities and in-person instruction, if necessitated by widespread virus transmission.

65.   The Interim COVID-19 Guidance for Schools also required that individual reopening plans certify that they would comply with a comprehensive list of government-mandated protocols in order to reopen.

66.   For example, pursuant to the Interim COVID-19 Guidance for Schools, individual reopening plans had to "ensure that appropriate social distancing is maintained between individuals while in school facilities" or that at "[a]ny time or place that individuals cannot maintain appropriate social distancing, individuals must wear acceptable face coverings."

67.   The Interim COVID-19 Guidance for Schools also noted that "[r]esponsible [p]arties must post signs throughout the school . . . consistent with DOH COVID-19 signage regarding public health protections against COVID-19" and "train all students, faculty, and staff on proper hand and respiratory hygiene."

68.   Furthermore, the Interim COVID-19 Guidance for Schools required "mandatory health screenings, including temperature checks, of students, faculty, staff, and, where applicable, contractors, vendors and visitors." "[A]ll individuals must have their temperature checked each day—ideally, at home, prior to departing school—before entering any school facility" and "must be denied entry into the facility" if their temperature is "greater than 100.0° F."

69.   For meals during school hours, responsible parties had to "ensure social distancing between individuals while eating in school cafeteria[s]," and "[i]f not feasible, meals [could] be served in alternate areas (e.g., classrooms) or in staggered meal periods to ensure social distancing and proper cleaning and disinfection between students."

70.   Additionally, the Interim COVID-19 Guidance for Schools recommended "cohort[ing] students" in "self-contained, pre-assigned groups of students with reasonable group size limits" to "limit potential exposure" to COVID-19.

71.   The Interim COVID-19 Guidance for Schools also recommended "staggered arrival and pick-up times to facilitate proper social distancing."

72.   In the event that an individual tested positive for COVID-19, responsible parties "must immediately notify the state and local health department about the case" and "develop plans to support local health departments in tracing all contacts of the individual" in accordance with government regulations.

73.   School districts, boards of cooperative educational services, charter schools, and private schools were required to certify that they read and understood the State's guidance.

74.   Such entities also had to submit individual reopening plans that complied with the State's guidance as described above. Individual reopening plans were due by July 31, 2020. The Interim COVID-19 Guidance for Schools explained that reopening plans "should be presumed to be approved upon submission, unless otherwise notified by the State that modifications are necessary to ensure compliance with this guidance."

## C. BYAM's Reopening Plan

75.   On July 31, 2020, BYAM submitted its individual reopening plan. To date, the State has not notified BYAM that modifications are necessary to BYAM's reopening plan to ensure compliance with the State's guidance.

76.   Pursuant to the State's requirements, BYAM's reopening plan covered (1) re-opening of school facilities for in-person instruction; (2) monitoring of health conditions; (3) containment of potential transmission of COVID-19; and (4) closure of school facilities and in-person instruction, if necessitated by widespread virus transmission.

77.   BYAM's reopening plan noted that the school has "28,000 square feet of facility" for its more than 300 students The reopening plan promised to arrange BYAM's facilities consistent with local building and fire codes while simultaneously ensuring adequate PPE, social distancing, and hygiene.

78.   Consistent with the Interim COVID-19 Guidance for Schools, BYAM's opening plan mandated that "[a]ll students, faculty[,] and staff will maintain appropriate social distancing as feasible, which means six feet of space in all directions between individuals unless safety or the core activity . . . requires a shorter distance or individuals are of the same household."

79.   Additionally, in line with the Interim COVID-19 Guidance for Schools, the reopening plan mandated that "[s]tudents, faculty, and staff will use face coverings and PPE when not social distancing."

80.   To reinforce State guidelines and the school's own requirements for social distancing and face coverings, the reopening plan promised to place appropriate signage throughout the building. Specifically, in addition to training teachers and students in proper social distancing and hygiene protocol, BYAM promised to comply with the State's requirements and place signage reminding students to socially distance, wear masks, and wash their hands throughout its facilities. Additional informational material was also made available for distribution in the main office.

81.   With respect to health screenings, BYAM's reopening plan promised to comply with requirements imposed by the Interim COVID-19 Guidance for Schools. Namely, the reopening plan promised to conduct daily temperature checks and to

13

deny entry into the facility to any individual who presented a temperature of greater than 100.0° F."

82. Additionally, the reopening plan required staff "to use a daily screening questionnaire for faculty and staff to self [assess] for possible sickness." Parents were also "required to self assess their children before sending them to school" and "to immediately notify the school of a positive COVID-19 test" or if their "child is found to not be feeling well [or] present[] a fever . . . or other symptoms."

83. BYAM's reopening plan also went above and beyond the State's mandate for serving meals during school hours. To minimize the risk of possible COVID-19 transmission, BYAM made the difficult decision to discontinue its school lunch service and instead asked students to bring lunches from home. The reopening plan then required that "[a]ll meals . . . be consumed by students and staff in their respective classroom or offices" instead of a large cafeteria and promised "cleaning and disinfection" between different meal periods if the meals took place in the same common area.

84. Furthermore, though not expressly required, BYAM followed the State's recommendation and "utiliz[ed] the cohort methodology of infection control and mitigation."

85. On September 8, 2020, BYAM reopened for its first day of school for elementary school students.

86. Since reopening, BYAM has fully complied with government regulations and its own government-approved reopening plan.

87. Specifically, BYAM has continued to require social distancing and the use of face masks and PPE in compliance with State requirements and BYAM's own government-approved reopening plan. BYAM has also placed students in cohorts per the State's recommendations, discontinued its lunch programs, required students to bring meals prepared at home, staggered student arrivals and pick-ups at different times and areas, moved in-door activities outdoors when feasible, discussed issues

with parents and other stakeholders, and developed procedures to track possible COVID-19 cases in BYAM's student population.

88.   Due to the comprehensive measures adopted by BYAM and the vigilance of its teachers, students, and families, no student at BYAM has contracted COVID-19 from school activities.

89.   Indeed, in one instance, pursuant to BYAM's requirement that parents "self assess their children before sending them to school," a mother notified BYAM that a student's father was feeling ill. In response, BYAM instructed the mother to keep the child at home, and it was later discovered that father and the family contracted COVID-19. Pursuant to the State guidance and BYAM's reopening plan, that student was quarantined and did not attend in-person instruction at BYAM again until she fully recovered, exhibited no symptoms, and was found to not be able to transmit COVID-19. In other words, BYAM's protocols successfully prevented the possibility of COVID-19 transmission in the school.

**D. The September and October Orders**

90.   On September 28 and September 30, 2020, Governor Cuomo identified "20 hotspot ZIP codes" in which there was purportedly a higher positivity rate and number of positive tests, relative to the rest of the state. Andrew Cuomo (@NYGovCuomo), Twitter (Sept. 30, 2020, 11:09 AM), https://twitter.com/NYGovCuomo/status/1311337339197808641; *see also Audio & Rush Transcript: Governor Cuomo Deploys Rapid Result Testing Machines to Address Recent Uptick in Cases in Cluster Zip Codes* (Sept. 28, 2020), https://perma.cc/NR6P-Q5M5. The list included BYAM's ZIP code, 11691.

91.   Governor Cuomo associated these "hotspot zip codes" with "the Orthodox community," stating that he had "spoken to the Orthodox community with the hotspot zip codes," and that while they had agreed "to take action on their own," "enforce-

ment" was "going to be stepped up." *Audio & Rush Transcript: Governor Cuomo Updates New Yorkers on State's Progress During Covid-19 Pandemic* (Oct. 1, 2020), https://perma.cc/ZE7S-WSSC.

92.    Also on September 28, the Commissioner of the New York City Commission of Health and Mental Hygiene imposed a series of new restrictions on "non-public schools" in eight of these ZIP codes. Order of the Commissioner of Health and Mental Hygiene (Sept. 28, 2020), https://perma.cc/6AX3-8ZNT.

93.    This order required, *inter alia*, that in private schools "in the affected zip codes" "[a]ll individuals must remain at least 6 feet apart at all times, except: in emergencies or when doing so would create a safety hazard[,] or when physical barriers are put in place between individuals"; and "[f]ace coverings are required in school buildings at all times, except for individuals who cannot wear a face covering because of developmental, medical or age reasons." *Id.*

94.    The eight ZIP codes covered by the Commissioner's September 28 order corresponded with predominantly Orthodox Jewish neighborhoods. The order did not apply to six ZIP codes from Governor Cuomo's list that had comparable or higher positivity rates and positive tests, but that did not correspond to predominantly Orthodox Jewish neighborhoods.

95.    On or before Friday, October 2, Orthodox Jewish schools, including BYAM, closed to observe the holiday of Sukkot. The holiday would end on October 11, and schools would reopen on Tuesday, October 13.

96.    On October 4, however, Mayor de Blasio announced a plan to "rewind[] the reopening" in the 20 ZIP codes identified as "hotspots." Daniel E. Slotnik, *A New Battle Against the Virus Is Set for 9 ZIP Codes*, New York Times (Oct. 5, 2020), https://perma.cc/43SU-KMYG. In nine of those ZIP codes—including BYAM's—all public and private schools, as well as "nonessential" businesses, would be required to close, and restaurants would be required to serve takeout only. *Id.* In the other 11

ZIP codes, schools would remain be allowed to remain open, with lesser restrictions on businesses and restaurants. *Id.*

97.   The Mayor's plan did not propose to impose new restrictions on houses of worship. *Id.* City officials attributed that to this Court's decision in *Soos v. Cuomo*, No. 1:20-cv-651 (GLS/DJS), 2020 WL 3488742 (N.D.N.Y. June 26, 2020), which had enjoined Governor Cuomo and Mayor de Blasio's previous efforts to discriminate against houses of worship and religious gatherings relative to other businesses and activities presenting comparable risks, thus requiring that houses of worship be permitted to open at least 50% capacity.

98.   The nine ZIP codes that would be subject to the most restrictive new rules "all have large populations of Orthodox Jews." Amelia Nierenberg & Adam Pasick, *N.Y.C. Closes Some Schools . . . Again*, New York Times (Oct. 5, 2020), https://perma.cc/UL4F-55VP.

99.   Although schools would be closed in these nine ZIP codes under Mayor de Blasio's plan, the Mayor conceded that "We have seen very little coronavirus activity in . . . schools." *Id.*

100. The Mayor's plan would have to be approved by Governor Cuomo to take effect.

101. On October 5, however, Governor Cuomo refused to approve Mayor de Blasio's plan. The Governor faulted the plan for relying on ZIP codes, stating that "targeting by zip codes is imperfect" because "neighborhoods and communities aren't organized by zip codes." *Video, Audio, Photos & Rush Transcript: Governor Cuomo Updates New Yorkers on State's Progress During COVID-19 Pandemic* (Oct. 5, 2020), https://perma.cc/67T4-TDPH.

102. Governor Cuomo also faulted the plan because it "does not close religious institutions." *Id.* Rather than focusing on non-essential businesses, the Governor stated that "religious institutions have been a problem." *Id.*

103. In this press conference, Governor Cuomo repeatedly referenced "the Ortho-dox community," the "Jewish community" and "rabbi[s]." He stated that he was "going to meet with members of the Ultra Orthodox community" and tell them "[i]f you're not willing to live with these rules then I'm going to close the synagogues."

104. Further, to illustrate his claim that "[r]eligious gatherings . . . have been a problem," he displayed on a slide two photographs of gatherings of Orthodox Jews. No other photographs of religious gatherings were shown.

105. Although the Governor stated that the photographs had been taken "in the recent past," one of them had in fact been taken at a funeral in upstate New York in 2006.

106. The next morning, October 6, Governor Cuomo participated in a telephone call with several Jewish leaders. On the call, the Governor acknowledged that the "current rule" for houses of worship was "50% of capacity," and stated that "if we follow the rules on the mask and the social distancing and the 50%," "the rate will come down." *See* Reuvain Borchardt, *Exclusive Full Recording: Jewish Leaders Say They Were 'Stabbed in the Back' by Cuomo*, Hamodia (Oct. 12, 2020, 3:58 AM), https://perma.cc/AR79-MAXD.

107. In that same phone call, the Governor responded to a question asking why schools had to be completely shuttered. The Governor responded to the question by stating that even though schools are not spreaders of COVID-19, the only reason be-hind the indefinite closure of Orthodox Jewish schools is that "the fear is too high to do anything" else. *Id.* at 19:08-20:57.

108. The Governor stated: "Your point is right: why close every school? Why don't you test the schools and close the ones that have a problem? I know, but first, I don't know that we have the resources to do that now. But I can tell you honestly, the fear is too high to do anything other than, 'Let's do everything we can to get the infection

rate down now, close the doors, close the windows.' That's where we are." *Id.* at 20:18-20:52.

109. Governor Cuomo admitted that, regarding blanket school closures, that "you could say there's a better way to do this. I know. But we're dealing with emotion and fear as much as anything. And I'll tell you, it's New York City, we have a real problem with fear and anxiety, and people losing confidence in the city . . . and who's afraid. So it is a blunt policy, I agree with you, but at this point I don't think that we can do anything more sophisticated." *Id.* at 21:33-22:21.

110. Later that day, the Governor held another press conference. At that press conference, Governor Cuomo announced a "New Cluster Action Initiative" superseding Mayor de Blasio's plan.

111. The Initiative identifies purportedly at-risk areas by "cluster," rather than by ZIP code, dividing those areas into "red," "orange," and "yellow" zones, and subjecting these zones to different levels of restrictions.

112. The Initiative closes altogether any schools falling within red or orange zones.

113. Squarely contradicting the Governor's representation to Jewish leaders only hours earlier, the Initiative also imposes stringent limitations on houses of worship falling within red or orange zones. In red zones, houses of worship are limited to the lesser of 25% capacity or 10 people; in orange zones they are limited to the lesser of 33% capacity or 25 people.

114. Meanwhile, while the Initiative closes non-essential businesses located in red zones and restricts dining to takeout only, all "essential" businesses remain open without capacity limitations. A broad swath of businesses are defined as "essential," including gardening services, convenience stores, pet shops, and—bizarrely, given the total closure of schools—"child care services." *Guidance for Determining Whether a Business Enterprise is Subject to a Workforce Reduction Under Executive Order*

*202.68, Related to New York's Cluster Action Initiative to Address COVID-19 Hotspots* (Oct. 7, 2020), https://perma.cc/9WL8-EVW6.

115. In orange zones, commercial businesses are subject to few additional restrictions. Only certain high-risk non-essential businesses, like gyms and barber shops, are closed, and restaurants are limited to takeout or outdoor dining with a four-person maximum per table. All other businesses are entirely unaffected.

116. The red and orange zones were specifically drawn to capture Orthodox Jewish neighborhoods.

117. Indeed, in an October 9 interview, Governor Cuomo admitted as much, stating that "we have a couple of unique clusters, frankly, which are more religious organizations, *and that's what we're targeting.*" *Audio & Rush Transcript: Governor Cuomo Is a Guest on CNN Newsroom with Poppy Harlow and Jim Sciutto* (Oct. 9, 2020), https://perma.cc/LDV2-8EVR (emphasis added).

118. Governor Cuomo has continued to make clear that the Initiative is intended to target the Orthodox Jewish community.

119. He has, for example, noted that "[t]he issue is with that ultra-Orthodox community." *Id.*

120. Governor Cuomo has also publicly dismissed the concerns of the Orthodox Jewish community and claimed that their opposition was solely being driven by President Trump and likened the Orthodox Jewish community to white supremacists.

121. The Governor stated: "Look, the president fans division. He does. He always has, started in Charlottesville with KKK there are good people on both sides. No. The KKK is not good. Racism is not good. Discrimination is not good. Kidnapping is not good. Violence is not good. I see it here in New York with the political interference with this ultra-orthodox community that we have on our clusters. I believe that I have evidence that the Trump campaign is fueling their opposition and their divisiveness." *Id.*

122. The Governor thus compared Orthodox Jews to the KKK.

123. Governor Cuomo has also falsely and consistently asserted that the Orthodox Jewish community would not work with the Government to combat COVID-19.

124. The Governor stated: "Also, remember, this is not the first time we've had this discussion with members of this community [the Orthodox Jewish community]. We went through this just recently with the measles vaccine. Same argument. Same argument." *Audio & Rush Transcript: Governor Cuomo Announces New Record High Number of COVID-19 Tests Reported* (Oct. 8, 2020), https://perma.cc/UK6H-JAKE.

125. The Governor repeated these claims throughout the following week, asserting that "[t]hese micro-clusters will continue . . . [because] [t]here will be certain populations who don't believe in the vaccine, religious reasons, the anti-vaxxers, and you'll continue to have clusters at least a year. By the way, this could go on for years, alright?" *Audio & Rush Transcript: Governor Cuomo Announces State Will Withhold Funds for Localities and Schools in COVID-19 Cluster Zones If They Fail to Enforce Public Health Law* (Oct. 14, 2020), https://perma.cc/6HR8-7CBA.

126. The Governor also stated: "There will be people who will not receive the vaccine for one reason or another. We went through this in the past with vaccines - some people don't believe in vaccines and they won't take the vaccine." *See* Audio & Rush Transcript: Governor Cuomo Updates New Yorkers on State's Progress During COVID-19 Pandemic (Oct. 12, 2020), https://perma.cc/KR96-G4BP.

127. The Governor has falsely claimed that the Orthodox Jewish community has never complied with State guidelines and that opposition was largely driven by politics.

128. The Governor stated: "Some of the complexity on the enforcement here, especially with members of the Ultra-Orthodox community — they have never complied with the rules and I have had dozens and dozens of conversations." *Audio & Rush Transcript: Governor Cuomo Announces State to Provide 200,000 Rapid Test Kits to*

*New York City Schools in "Yellow Zones"* (Oct. 15, 2020), https://perma.cc/TGB8-XFRC.

129.  The Governor also stated: "I've had personal conversations, dozens and dozens of them. It's not a question of education, it's a question of enforcement . . . . [T]he enforcement from the local governments is very uneven especially when it's politically sensitive. And that's what we're running to with lot of these ultra-Orthodox communities, who are also very politically powerful, don't kid yourself." *Audio & Rush Transcript: Governor Cuomo Announces State Will Withhold Funds for Localities and Schools in COVID-19 Cluster Zones If They Fail to Enforce Public Health Law* (Oct. 14, 2020), https://perma.cc/ZH7P-UALY.

130. The Governor's public comments targeting the Orthodox Jewish community are entirely consistent with the implementation of the Initiative.

131. For example, Figure 1 shows Brooklyn's red and orange zones as identified in the Initiative, superimposed on a map of Orthodox Jewish synagogues, yeshivas, and businesses in Brooklyn identified in an academic geography journal:



Figure 1. *See* Patrick Gallagher, *Identification and Analysis of Orthodox Jewish Enclaves in Brooklyn, New York: A GIS Based Approach*, 42 Middle States Geographer 83, 85 (2009).

132. On October 6, Governor Cuomo issued Executive Order 202.68, formalizing the Cluster Action Initiative. The Order made the Cluster Action Initiative restrictions "effective immediately," and directed that they "may be enforced and shall be enforced no later than Friday, October 9, 2020, as determined by the county in which the red zones, orange zones, and yellow zones are located."

133. On October 7, Mayor de Blasio announced that the Order would be enforced in New York City beginning the next day. Jennifer Millman, *NYC Shutdowns in Cluster Zones Start Thursday; Fines Up to $15,000 a Day Apply for Violations*, NBC New York (Oct. 7, 2020, 3:24 PM), https://perma.cc/TY7E-7M6A.

134. That weekend—consisting of the important Jewish holidays of Hoshana Rabbah (October 9), Shmini Atzeres (October 10), and Simchas Torah (October 11), City officials made good on the Mayor's threat. "In total, officials issued 62 tickets and more than $150,000 in fines during the first weekend the new restrictions were in effect." Ali Watkins, *Over $150,000 in Fines Issued on First Weekend of New N.Y.C. Lockdown*, N.Y. Times (Oct. 13, 2020), https://perma.cc/UE8L-KDDZ.

135. Following the issuance of the Governor's order, a Jewish organization and the Roman Catholic Diocese of Brooklyn filed two separate lawsuits in the Eastern District of New York challenging the Governor's restrictions on houses of worship. *Agudath Israel of Am. v. Cuomo*, No. 20-cv-04834 (E.D.N.Y. Oct. 8, 2020); *Diocese of Brooklyn v. Cuomo*, No. 20-cv-04844 (E.D.N.Y. Oct. 8, 2020).

136. On October 9, 2020, Judge Matsumoto issued an oral ruling denying a temporary restraining order in *Agudath Israel*. No. 20-cv-04834, Minute Entry (E.D.N.Y. Oct. 9, 2020).

137. That same day, Judge Komitee, sitting as Miscellaneous Judge, denied the Diocese of Brooklyn's request for a temporary restraining order. In so doing, the court explained that "the Governor of New York made remarkably clear that this Order was intended to target [Orthodox Jewish] institutions." *Diocese of Brooklyn v. Cuomo*, No. 1:20-cv-04844, Doc. 15 at 3 (E.D.N.Y. Oct. 9, 2020).

138. Following these rulings, Governor Cuomo has acknowledged that the COVID-19 statistics that triggered the restrictions at issue here would be "nothing" "[t]o other states." *Audio & Rush Transcript: Governor Cuomo Updates New Yorkers on State's Progress During COVID-19 Pandemic* (Oct. 12, 2020), https://perma.cc/HVX3-2QH8.

139. On October 12, he stated that the "micro-clusters" targeted by his orders are not "a national hot spot," and indeed would be considered a "safe zone" or a "cool spot" elsewhere. *Id.*

140. It was only because the Governor sought an "absurdly low" goal of "1 percent" positivity rates—an admittedly "unrealistic" figure when considered "intellectually," but one that appeals to him "emotionally"—that new restrictions in the red and orange zones were imposed. *Id.*

141. Nonetheless, the Governor has already heightened the penalties for violating his October 6 order. On October 14, the Governor issued a new executive order "authoriz[ing] the director of the budget . . . to withhold any funds appropriated in the FY20 Enacted Budget" for nonpublic schools if the school "is found to have been in violation of Executive Order 202.68" or "of any order of the department of health issued pursuant to Executive Order 202.68." *No. 202.69 Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency* (Oct. 14, 2020), https://perma.cc/979Q-7XEX.

**E. The Orders' Impact on Plaintiffs**

142. BYAM is in a red zone. Under the Governor's orders, then, BYAM has been shuttered entirely—despite its rigorously following the State's earlier COVID-related guidance and despite its having never had a case of the virus contracted through school activities.

143. This indefinite forced closure has had and will continue to have a devastating impact on Plaintiffs' religious exercise, jeopardizing their ability to pass on their faith and way of life to the next generation through the many aspects of a religious education at BYAM that cannot be replicated through virtual means.

144. BYAM seeks the right to reopen on Tuesday, October 27, after testing all students and staff. October 27 is 14 days after BYAM intended to reopen after the holidays on October 13. Upon reopening, BYAM intends to continue the precautionary measures set out in its reopening plan, which thus far have prevented the BYAM community from contracting even a single case in school activities.

## CLAIMS FOR RELIEF

### Count I
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Exercise Clause: *Wisconsin v. Yoder*, 406 U.S. 205 (1972)

145. Plaintiffs incorporate by reference all preceding paragraphs.

146. "[T]he traditional interest of parents with respect to the religious upbringing of their children" is a "fundamental right[] and interest[]" and is "specifically protected by the Free Exercise Clause of the First Amendment." *Wisconsin v. Yoder*, 406 U.S. 205, 214, (1972)

147. Government actions that interfere with parents' ability to direct the religious upbringing of their children are subject to strict scrutiny. *Id*. at 214 (when government action "interferes with the practice of a legitimate religious belief, . . . the State [must] not deny the free exercise of religious belief by its requirement" or the State must demonstrate an "interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause").

148. By shuttering religious schools in the Orthodox Jewish community, Defendants have interfered with Plaintiffs' right to direct the religious upbringing of their children and the vital role that religious schools such as Bais Yaakov Ateres Miriam "play in the continued survival of [Orthodox Jewish] communities." *Leebaert v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003) (quoting *Yoder*, 406 U.S. at 235).

149. The entire point of the BYAM movement is to educate Orthodox Jewish girls *outside the home*. That point is undermined entirely if BYAM schooling is indefinitely suspended.

150. Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further a governmental interest.

151. Absent injunctive and declaratory relief against Defendants, Plaintiffs will suffer imminent and irreparable harm.

152. As a result of Defendants' actions, Plaintiffs have suffered actual damages.

**Count II**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause: Not Neutral**

153. Plaintiffs incorporate by reference all preceding paragraphs.

154. "[T]he minimum requirement of neutrality is that a law not discriminate on its face." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). "[A] law targeting religious beliefs as such is never permissible." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2024 n.4 (2017) (quoting *Lukumi*, 508 U.S. at 533).

155. Government actions burdening religion must face strict scrutiny when they are taken pursuant laws which are not neutral. *See Lukumi,* 508 U.S. at 533-43.

156. By adopting policies that facially discriminate against the Orthodox Jewish community and their communal activities, Defendants have targeted Plaintiffs' religious activities for discrimination and chilled the free exercise of religion.

157. The statements of Defendants demonstrate that hostility toward Plaintiffs was a motivation for Defendants' actions.

158. Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further a governmental interest.

159. Absent injunctive and declaratory relief against Defendants, Plaintiffs will suffer imminent and irreparable harm.

160. As a result of Defendants' actions, Plaintiffs have suffered actual damages.

## Count III
### 42 U.S.C. § 1983
### Violation of the First Amendment to the U.S. Constitution
### Free Exercise Clause: Not Generally Applicable

161. Plaintiffs incorporate by reference all preceding paragraphs.

162. "[L]aws burdening religious practice must be of general applicability." *Lukumi*, 508 U.S. at 542.

163. A law is not generally applicable when it "fail[s] to prohibit nonreligious conduct that endangers" the government's regulatory interest "in a similar or greater degree" than the prohibited religious conduct. *Id.* at 543. "[T]he more exceptions to a prohibition, the less likely it will count as a generally applicable, non-discriminatory law." *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020) (citation omitted).

164.  In other areas where the threat of COVID-19 is similar to or greater than the threat posed in Plaintiffs' jurisdiction, Defendants and other government actors have not restricted analogous activities that pose the same or greater risks than Plaintiffs' religious activities.

165. For example, child-care activities may continue in red and orange zones, while schools may be closed. Religious worship gatherings may continue, in a restricted form, but religious schooling is indefinitely closed.

166. Defendants have targeted Plaintiffs' religious activities and made statements calculated to chill Plaintiffs' religious exercise even though Plaintiffs have fully complied with government-mandated protocols.

167. Defendants do not have a compelling reason for their distinction between Plaintiffs' religious activity and other similar activity.

168. Defendants have not selected the means least restrictive of religious exercise in order to further their interests.

169. Absent injunctive and declaratory relief against Defendants, Plaintiffs will be irreparably harmed.

170. As a result of Defendants' actions, Plaintiffs have suffered actual damages.

### Count IV
### 42 U.S.C. § 1983
### Violation of the Fourteenth Amendment to the U.S. Constitution
### Equal Protection: Discrimination Based on Religion

171. Plaintiffs incorporate by reference all preceding paragraphs.

172. The Equal Protection Clause prohibits government conduct that either violates a fundamental right or unjustifiably disadvantages a suspect class of individuals.

173. Defendants' decision to place greater, more onerous restrictions on Orthodox Jewish communities and organizations violates the fundamental right to the free exercise of religion and discriminates against Plaintiffs based on their religious affiliation as Orthodox Jews.

174. Other people and organizations that espouse religious beliefs besides Orthodox Judaism are permitted to operate outside Defendants' new, more onerous restrictions.

175. Defendants' decision to penalize Plaintiffs based on their religious affiliation as Orthodox Jews violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

176. Defendants do not have a compelling reason for their actions, and Defendants have not selected the means least restrictive of religious exercise in order to further a governmental interest.

177. Absent injunctive and declaratory relief against Defendants, Plaintiffs will suffer imminent and irreparable harm.

178. As a result of Defendants' actions, Plaintiffs have suffered actual damages.

## Count V
## 42 U.S.C. § 1983
## Violation of the First Amendment to the U.S. Constitution
## Freedom of Assembly

179. Plaintiffs incorporate by reference all preceding paragraphs.

180. The First Amendment to the U.S. Constitution protects the "right of the people peaceably to assemble." The states are bound by this guarantee. *De Jonge v. Oregon*, 299 U.S. 353 (1937).

181. The freedom to assemble is a fundamental right, *Brandenburg v. Ohio,* 395 U.S. 444, 457 n.4 (1969), and "consistently with the Federal Constitution, peaceable assembly for lawful discussion cannot be made a crime." *De Jonge*, 299 U.S. at 365.

182. Defendants do not have a compelling interest in restricting Plaintiffs' religious activities while allowing other similar activities.

183. Forbidding Plaintiffs peaceably to assemble is not the least restrictive means of furthering Defendants' interests.

184. Absent injunctive and declaratory relief against Defendants, Plaintiffs will suffer imminent and irreparable harm.

185. As a result of Defendants' actions, Plaintiffs have suffered actual damages.

## Count VI
## 42 U.S.C. § 1983
## Violation of the First Amendment to the U.S. Constitution
## Freedom of Association

186. Plaintiffs incorporate by reference all preceding paragraphs.

187. The freedom to associate "for the advancement of beliefs is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment." *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958). The right to associate for "the exercise of religion" is one of the "indispensable means of preserving other individual liberties." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).

188. Abridgements of the freedom to associate are subject to strict scrutiny.

189. Defendants' threatened discriminatory policies are a prior restraint of Plaintiffs' right to associate for the exercise of religion.

190. Defendants do not have a compelling interest in restricting Plaintiffs' religious activities while allowing other similar activities.

191. Defendants' discriminatory policies are not the least restrictive means of furthering Defendants' interests.

192. Absent injunctive and declaratory relief against Defendants, Plaintiffs will suffer imminent and irreparable harm.

193. As a result of Defendants' actions, Plaintiffs have suffered actual damages.

**Count VII**
**42 U.S.C. § 1983**
**Violation of the First Amendment to the U.S. Constitution**
**Freedom of Speech**

194. Plaintiffs incorporate by reference all preceding paragraphs.

195. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).

196. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

197. Defendants' discriminatory policies restrict Plaintiffs' ability to discuss and promote their religious beliefs at BYAM based on the speech's religious content.

198. Defendants do not have a compelling interest in restricting Plaintiffs' religious speech while allowing other similar activities.

199. Defendants' discriminatory policies are not the least restrictive means of furthering Defendants' interests.

200. Absent injunctive and declaratory relief against Defendants, Plaintiffs will suffer imminent and irreparable harm.

201. As a result of Defendants' actions, Plaintiffs have suffered actual damages.

## JURY DEMAND

Plaintiffs request a jury trial on all issues so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a. Issue a declaration that Defendants must (1) cease discriminating against Plaintiffs on the basis of their Orthodox Jewish faith and (2) permit Plaintiffs to conduct in-person religious instruction.

b. Issue temporary, preliminary, and permanent injunctive relief (1) prohibiting Defendants from enforcing their unlawful policies against Plaintiffs' religious activities, (2) prohibiting Defendants from discriminating against Plaintiffs' religious beliefs, and (3) prohibiting Defendants from practices or engaging in any other conduct that chills Plaintiffs' free exercise of religion.

c. Award nominal damages to Plaintiffs.

d. Award actual damages to Plaintiffs.

e. Award Plaintiffs the costs of this action and reasonable attorney's fees; and

f. Award such other and further relief as the Court deems equitable and just.

Dated: October 16, 2020                 Respectfully submitted,

/s/ Eric C. Rassbach
Mark L. Rienzi (admission to be sought)
Eric C. Rassbach (N.D.N.Y. Bar No. 302836)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW
 Suite 700
Washington, DC 20036
erassbach@becketlaw.org
Telephone: (202) 955-0095
Facsimile: (202) 955-0090

Josh Blackman (admission to be sought)
Jewish Coalition for Religious Liberty
1303 San Jacinto Street
Houston, TX 77002
Telephone: (202) 294-9003

*Counsel for Plaintiffs*