## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

YITZCHOK LEBOVITS and
CHANA SHAPIRO-LEBOVITS, on
their own behalf and on behalf of their
daughters E.L., a minor, and A.L., a
minor; and
BAIS YAAKOV ATERES MIRIAM, a
New York religious corporation,

       *Plaintiffs,*

   v.

ANDREW M. CUOMO, individually
and in his official capacity as Governor
of the State of New York;
BILL DE BLASIO, individually and in
his official capacity as Mayor of the
City of New York;
LETITIA JAMES, in her official capac-
ity as Attorney General of the State of
New York;
HOWARD A. ZUCKER, in his official
capacity as Commissioner of the New
York State Department of Health;
CITY OF NEW YORK; and
NEW YORK CITY DEPARTMENT OF
HEALTH AND MENTAL HYGIENE,

       *Defendants.*

Civil No. 1:20-cv-01284-GLS-DJS
Hon. Gary L. Sharpe

**PLAINTIFFS' MEMORANDUM IN
SUPPORT OF APPLICATION FOR
ORDER TO SHOW CAUSE FOR
TEMPORARY RESTRAINING
ORDER**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

    A.  The Bais Yaakov Movement ........................................................................ 2

    B.  Bais Yaakov Ateres Miriam (BYAM) ......................................................... 3

    C.  BYAM's Efforts to Combat COVID-19 ...................................................... 4

    D.  Targeted Restrictions on Jewish Communities ......................................... 5

    E.  The Order's Impact on BYAM ................................................................... 9

    F.  COVID-19 and Schools ............................................................................. 9

LEGAL STANDARD .............................................................................................. 10

ARGUMENT .......................................................................................................... 11

    I.  Plaintiffs are likely to succeed on the merits. ........................................... 11

        A.  Defendants' actions violate *Yoder*. .................................................... 11

        B.  Defendants' actions are not neutral. ................................................... 13

        C.  Defendants' actions are not generally applicable. .............................. 17

        D.  Defendants cannot satisfy strict scrutiny. .......................................... 19

            1. Defendants' interest in closing BYAM is not compelling. ............... 20

            2. Defendants' shutdown is not the least restrictive means. ............... 23

    II.  The remaining factors favor injunctive relief. ........................................ 24

CONCLUSION ....................................................................................................... 25

EXHIBIT 1—Declaration of Eric Rassbach

EXHIBIT 2—Declaration of Rabbi Nathan (Nosson) Neuman

EXHIBIT 3—Declaration of Yitzchok Lebovits

EXHIBIT 4—Declaration of Dr. Timothy Flanigan

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudath Israel of Am. v. Cuomo,*
No. 20-cv-04834 (E.D.N.Y. Oct. 9, 2020) .................................................. 8

*Berean Baptist Church v. Cooper,*
2020 WL 2514313 (E.D.N.C. May 16, 2020)........................................ 18

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011) ................................................................. 19, 22

*Cal. Democratic Party v. Jones,*
530 U.S. 567 (2000) ......................................................................... 20

*Calvary Chapel Dayton Valley v. Sisolak,*
140 S. Ct. 2603 (2020) ..................................................................... 20

*Capitol Hill Baptist Church v. Bowser,*
No. 20-cv-02710 (TNM), 2020 WL 5995126 (D.D.C. Oct. 9, 2020) ................ 20, 22

*Cent. Rabbinical Cong. of U.S. & Can. v. NYC Dep't of Health &*
*Mental Hygiene,*
763 F.3d 183 (2nd Cir. 2014)............................................................ 11, 17

*Church of the Lukumi Babalu Aye v. City of Hialeah,*
508 U.S. 520 (1993) .......................................................................*passim*

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master*
*Fund Ltd.,*
598 F.3d 30 (2d Cir. 2010)................................................................. 10

*City of Cleburne v. Cleburne Living Ctr.,*
473 U.S. 432 (1985) ........................................................................ 23

*Diocese of Brooklyn v. Cuomo,*
No. 20-cv-04844, (E.D.N.Y. Oct. 9, 2020) ................................. 8, 9, 13, 17

*Elrod v. Burns,*
427 U.S. 347 (1976) ........................................................................ 24

*Emp. Div. v. Smith,*
494 U.S. 872 (1990) .................................................................... 11, 12

*Espinoza v. Mont. Dep't of Revenue,*
    140 S. Ct. 2246 (2020) ..................................................................... 13

*Fraternal Ord. of Police v. City of Newark,*
    170 F.3d 359 (3d Cir. 1999)............................................................. 19

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006) ......................................................................... 20

*Holt v. Hobbs,*
    574 U.S. 352 (2015) ......................................................................... 22

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905) ........................................................................... 20

*Jolly v. Coughlin,*
    76 F.3d 468 (2d Cir. 1996)......................................................... 10, 24

*Leebaert v. Harrington,*
    332 F.3d 134 (2d Cir. 2003)............................................................. 11

*Mandel v. Bradley,*
    432 U.S. 173 (1977) ......................................................................... 20

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018) ........................................................ 13, 14, 16

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ......................................................................... 23

*N.Y. Progress & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013)........................................................ 24, 25

*New Hope Family Servs., Inc. v. Poole,*
    966 F.3d 145 (2d Cir. 2020)............................................................. 14

*Nken v. Holder,*
    556 U.S. 418 (2009) ......................................................................... 25

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020) ............................................................ 2, 12, 13

*Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary,*
    268 U.S. 510 (1925) .................................................................... 11, 12

*Roberts v. Neace,*
    958 F.3d 409 (6th Cir. 2020) ......................................................*passim*

*S. Bay United Pentecostal Church v. Newsom,*
   140 S. Ct. 1613 (2020) ...................................................................... 18, 20

*Soos v. Cuomo,*
   2020 WL 3488742 (N.D.N.Y. June 26, 2020)...................................*passim*

*United States v. Playboy Ent. Grp.,*
   529 U.S. 803 (2000) ............................................................................ 23

*Ventura de Paulino v. NYC Dep't of Educ.,*
   959 F.3d 519 (2d Cir. 2020)............................................................ 10, 25

*Wisconsin v. Yoder,*
   406 U.S. 205 (1972) ...................................................................*passim*

## Other Authorities

Josh Blackman, *What Rights Are "Essential"? The 1st, 2nd, and 14th
   Amendments in the Time of Pandemic* (Oct. 9, 2020) ........................... 20

Asaf Kaniel, *Beys Yankev*, YIVO Encyclopedia of Jews in Eastern
   Europe........................................................................................ 2

Debora Weissman & Lauren B. Granite, *Bais Ya'akov Schools*, The
   Encyclopedia of Jewish Women .......................................................... 3

Bais Yaakov Project, *The Bais Yaakov Movement* ...................................... 2

*Blueprint for a Safer Economy, County Tier Status, "Can my school
   open under this blueprint?"*................................................................ 22

*Exodus* 33:11 ...................................................................................... 3

## INTRODUCTION

This case concerns whether the Bais Yaakov Ateres Miriam (BYAM) school for Jewish girls can reopen for in-person instruction as planned on Tuesday, October 27, despite government orders forbidding such instruction.

For over 100 years, Orthodox Jewish girls have been learning and practicing their faith in Bais Yaakov schools. And for almost as long, the Supreme Court has recognized that the Constitution protects the "fundamental right" of parents like Plaintiffs Yitzchok and Chana Lebovits to direct their children's religious education. That is as it should be, particularly in a country to which so many Jews came to escape persecution and to preserve the freedom to raise and educate children in their own faith.

In a different case, a court might be asked to ascertain the point at which this fundamental right must yield to a government's claim that in-person education poses a public health risk. Indeed, this Court already considered the public health claim once in *Soos v. Cuomo*, — F. Supp.3d —, 2020 WL 3488742 (N.D.N.Y. June 26, 2020), enjoining Governor Cuomo's and Mayor De Blasio's efforts to apply an indoor capacity limitation only on houses of worship. But this case is even easier, because here the Governor himself openly admits that COVID is "not being spread by schools." And BYAM is particularly safe, both because it follows rigorous, State-approved protocols—resulting in *zero* known cases to date in the school—and because it plans to test *all* students and staff before returning to school on October 27.

Nor can the government claim that the targeted Jewish neighborhoods have particularly high levels of COVID. To the contrary, as Cuomo recently stated that the COVID levels at issue are quite low ("To other states that's nothing"). Indeed, across the entire country, there is *not a single other state* whose protocols require school closures for the COVID levels that caused the instant shutdown.

So, if neither the inherent danger of school nor a particularly high COVID rate explains the school closure, what does? The evidence admits of only two other

explanations. One is religious targeting of the Orthodox, a charge the government *admits*. Another is that, as Cuomo recently stated, these closures are not driven by public health, but by "fear" of people "losing confidence" in the City and "moving out." In response, the State adopted what Cuomo called a "fear-driven" response that he acknowledges is a "very blunt" policy, "cut by a hatchet," which "is not the best way to do it," but which someday might give way to "a smarter, more tailored policy."

But fear is not a compelling government interest, and—even in a pandemic—constitutional rights deserve better than a hatchet job. That is particularly true where the government admits public health is not in jeopardy. BYAM and its families have a fundamental right to continue their education in the proven safety of their school, and the government has no valid reason to prevent their return to that safe environment. Accordingly, a temporary restraining order should issue.

## FACTUAL BACKGROUND

### A. The Bais Yaakov Movement

Bais Yaakov (also known as "Beys Yankev") is a global movement of Orthodox schools for Jewish girls. As the Supreme Court recognized just last Term, "[r]eligious education is a matter of central importance in Judaism." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2065 (2020). But until the 20th century, while Jewish boys were educated at yeshivas, in many Orthodox communities, girls received their education only in the home—outside of school, and away from their peers and rabbis. *See* Asaf Kaniel, *Beys Yankev*, YIVO Encyclopedia of Jews in Eastern Europe, https://perma.cc/6BUN-6ZSR.

The first Bais Yaakov school was founded by Sarah Schenirer in Krakow, Poland, in 1917. *Id.* She founded the school to provide girls with access to rigorous and holistic Orthodox Jewish education, including both religious and secular studies. *See id*; The Bais Yaakov Project, *The Bais Yaakov Movement*, https://perma.cc/D2W3-M9T7. Under her charismatic leadership, Bais Yaakov schools spread throughout Europe,

educating tens of thousands of Jewish women. Deborah Weissman & Lauren B. Granite, *Bais Ya'akov Schools*, The Encyclopedia of Jewish Women, https://perma.cc/VY34-NBMZ. Because work outside the home was often an economic necessity for Orthodox women in pre-World War II Europe, Bais Yaakov schools also offered professional training in bookkeeping, nursing, and education. *See id.* The schools spread to the U.S. and Israel in the late 1930s, where they continued Schenirer's vision of nurturing Jewish girls' commitment to their religious and cultural heritage by educating them outside the home, in community with their peers, and with the religious leadership of their rabbis. *See id.*

### B. Bais Yaakov Ateres Miriam (BYAM)

BYAM is a school affiliated with the Bais Yaakov movement located in Far Rockaway, Queens. Neuman Decl. (Ex.2) ¶7. It was founded in 2012 by Rabbi Nathan (Nosson) Neuman. *Id.* After beginning as a preschool with only 31 students, BYAM has grown to more than 300 students from nursery school through 8th grade, *id.* ¶8, among them the daughters of Plaintiffs the Lebovitses. Lebovits Decl. (Ex.3) ¶¶5-6.

BYAM exists to instill the values and traditions of Orthodox Judaism in the next generation of women. *Id.* ¶9. In-person education is a critical component of this religious mission—and of Orthodox Judaism—as BYAM understands it. The study and implementation of Torah constitutes the ultimate religious experience for Jewish youth, and that practice is at the heart of a BYAM education. *Id.* ¶10. Jewish law teaches that Torah is acquired only in a group setting, *id.*, and that Torah study can only be fully experienced face-to-face, from teacher to pupil or between colleagues— just as when God first gave the Torah he did so by "speak[ing] to Moses face to face, as a man speaks to his friend." *Exodus* 33:11; *see* Ex.2 ¶11.

Communal prayer fills a student's day, as do time-honored methods of holistic education not replicable outside of a school environment—such as group singing, group projects designed to instill ethical values, and ritual food preparation. *Id.* ¶¶12-

13, 17, 24, 28. The school also celebrates holidays and religious customs throughout the year. *Id.* ¶¶25-27. BYAM is also the forum for important rites of passage in a young girl's life, such as the *Siddur* ceremony, where girls receive a prayer book from the Rabbi with their names inscribed. *Id.* ¶¶22-23. None of these experiences could be fully replicated by telelearning, threatening the vitality of these traditions and the religious messages they convey in students' lives. *Id.*

## C. BYAM's Efforts to Combat COVID-19

As the COVID-19 pandemic hit New York in March 2020, BYAM willingly moved to remote instruction for the remainder of the school year out of religious and ethical concerns for their neighbors. *Id.* ¶32. BYAM spent thousands of dollars to equip the school with wireless Internet and to purchase additional laptops and tablets for students and teachers to use for remote instruction. *Id.* ¶33.

Over the summer, the State issued a guidance document requiring schools that sought to reopen for in-person instruction in the fall to "develop individual plans for reopening and operating during the COVID-19 public health emergency" satisfying the "standards set forth in" the guidance. Flanigan Decl. (Ex.4), Ex.F at 1. The document provided that plans would be "presumed to be approved upon submission, unless otherwise notified by the State that modifications are necessary to ensure compliance." *Id.* at 22. BYAM submitted its plan on July 31. Ex.2 ¶35. The plan has thus been approved, as the State has not notified BYAM of any needed modification. *Id.* ¶36.

On September 8, BYAM reopened. *Id.* ¶37. Since reopening, BYAM has fully complied with government regulations and its approved reopening plan. *Id.* BYAM operates out of a 28,000 square-foot facility with adequate personal protective equipment, space for social distancing, and ability to maintain clean facilities. Ex.2-D (BYAM Reopening Plan) at 1. Its plan mandates that students, faculty, and staff engage in social distancing or wear face covering at all times. *Id.* at 1-2.

To facilitate social distancing, BYAM "utiliz[es] the cohort methodology," under which groups of students and teachers stay together throughout the day to minimize cross-exposure. *Id.* at 1. BYAM has trained its students on proper hand hygiene. *Id.* at 3. It temperature-checks every individual who attempts to enter the building every day. *Id.* at 4. Staff members and students (via parents) are required to assess their health daily before reporting to school, and to stay home if feeling unwell. *Id.* If a student or staff member were to test positive for COVID-19, she would be barred from returning until she is no longer capable of spreading it. *Id.* Likewise, anyone who knows or suspects they were exposed, even without a positive test, must quarantine before returning. *Id.* BYAM has also ceased providing meal service. *Id.* at 3.

BYAM's efforts have worked. To date, it has not had a single reported case of COVID-19 in the school. BYAM has thus proven to be a safe place for its students to spend their days.

### D. Targeted Restrictions on Jewish Communities

In late September, the Governor identified "20 hotspot ZIP codes" purportedly with higher positivity rates than the rest of the state. Rassbach Decl. (Ex.1), Exs.A, D. Cuomo associated these "hotspots" with New York's "Orthodox community," and warned that "enforcement" was "going to be stepped up." Ex.1-E.

On September 28, the Commissioner of the New York City Department of Health and Mental Hygiene imposed new restrictions on "non-public schools" in eight of these ZIP codes. Ex.1-F. The new restrictions required, subject to narrow exceptions, masks and 6-foot distancing by "[a]ll individuals," "at all times." *Id.* at 3. The eight ZIP codes covered by the new restrictions—BYAM's among them—included predominantly Orthodox Jewish neighborhoods. *Id.* at 2. The order *didn't* apply, however, to six of the purported "hotspot" ZIP codes that *weren't* predominantly Orthodox Jewish. *Id.*; *see* Ex.1-EE.

On October 2, Orthodox Jewish schools across the City, including BYAM, closed for a week to observe Sukkot—a major holiday. Meanwhile, on October 4, Mayor de Blasio announced a plan not just to impose heightened restrictions on Orthodox Jewish schools but to shutter them altogether. *Id.*, Ex.1-O at 1. The Mayor proposed to close all schools and "nonessential businesses" in 9 of the 20 "hotspot" ZIP codes, but leave houses of worship open at their current, 50%-capacity, recognizing this Court had required as much in *Soos*. Ex.1-O at 2 ("Places of worship will remain open, though only at 50 percent capacity, because of a federal court order"). The ZIP codes targeted under the Mayor's plan had "large populations of Orthodox Jews." Ex.1-P at 2. And although the plan shuttered schools, the Mayor himself acknowledged that the City had "seen very little coronavirus activity in . . . schools." *Id.*

The Mayor's plan was thus plainly aimed at Orthodox Jews. The next day (October 5), however, the Governor rejected the plan as not "targeted" *enough*. Ex.1-G. Cuomo objected to the plan's use of ZIP codes, stating instead that heightened restrictions should be imposed on "[n]eighborhoods and communities." *Id.* at 9. And the Governor wasn't coy about the particular "community" he had in mind, referring repeatedly to "the Orthodox community," the "Jewish community," and "rabbi[s]," and ultimately threatening that he was "going to meet with members of the ultra-Orthodox community" and tell them "if you're not willing to live with the[] rules, then I'm going to close the synagogues." *Id.* at 2, 6, 7, 8, 10; Ex.1-Z at 2.

The Governor also objected to the Mayor's plan because it followed this Court's *Soos* decision. The Governor claimed "[r]eligious gatherings . . . have been a problem," and vowed to "close religious institutions." Ex.1-G at 7. To illustrate, the Governor displayed two photographs of gatherings by members of one *particular* religion—Orthodox Jews. Ex.1-Q. And although the Governor stated that the photographs had been taken "in the recent past," Ex.1-G at 7, one of them in fact derived from a funeral

held in 2006. Ex.1-Q. The Governor, however, *agreed* with the Mayor about one thing: the virus is "not being spread by schools." Ex.1-R at 4.

The next day, Cuomo met with certain Jewish leaders by phone. Ex.1-U. On the call, he said that "clos[ing] every school" is "a blunt policy" and "not the best way to do it." *Id.* at 19:00-20:52, 21:33-22:28. But he said that "the fear [was] too high" in the City to take "a smarter, more tailored approach." *Id.* He said "we have a real problem with fear and anxiety" and people "moving out." *Id.* Thus he would "[c]lose the doors, close the windows" until "the anxiety comes down," even while acknowledging that it was "not a policy being written by a scalpel," but rather one "cut by a hatchet." *Id.*

Later on October 6, Governor Cuomo at a press conference unveiled a "New Cluster Action Initiative," which he previously noted would "sharpen" Mayor de Blasio's plan. Ex.1-H at 4; Ex.1-U at 3. The new initiative slashed house-of-worship capacity limits in certain areas of the City. And although the Governor had already recognized that schools weren't spreading the virus—and had acknowledged just hours before that closing schools without school-specific testing is supported more by "fear" and "anxiety" than reason—the new initiative shuttered schools entirely in those areas.

Specifically, the initiative identified "clusters" in areas of Brooklyn, Queens, and Broome, Orange, and Rockland Counties that would be targeted for additional restrictions. Ex.1-FF at 2. In certain areas—"red" and "orange zones"—the initiative would close schools altogether and cut house-of-worship capacity limits from 50% to the *lesser* of either 25% or 10 people (red zones) or 33% or 25 people (orange zones). *Id.* at 2-3; Ex.1-B. The Governor stated these rules would be in effect for a minimum of 14 days, "and then we'll see where we are . . . from there." Ex.1-H at 6.

Consistent with Governor Cuomo's concern that regulation-by-ZIP-code couldn't adequately target disfavored "neighborhoods and communities," the clusters were narrowly drawn to capture Orthodox Jewish neighborhoods, and *only* those neighborhoods. Ex.1-G at 9. Indeed, in an October 9 interview, Governor Cuomo admitted as

much, acknowledging that "we have a couple of unique clusters, frankly, which are more religious organizations, *and that's what we're targeting.*" Ex.1-K at 2 (emphasis added).

Likewise, the new restrictions discriminated against core Orthodox Jewish religious practices—education and worship. For example, while in red zones schools were shuttered and most houses of worship limited to 10 people, "essential" businesses could remain open without any capacity limitations. Ex.1-B; Ex.1-I. "Essential" business is a broad category including everything from "gardening" to "pet food" stores to "child care services." Ex.1-I at 4-6. Gathering children together to learn Torah at a yeshiva ("school") is thus forbidden, but gathering the same children to spend the day together playing at a daycare ("child care services") is permitted.

Similarly, the initiative imposed restrictions only on "non-essential gatherings"— suggesting there is some (undefined) category of *essential* gatherings that are entirely unaffected. Ex.1-B. Further, in orange zones, "non-essential gatherings" *other than schools* are permitted for up to 10 people, *id.*—meaning that while in an orange zone a group of 10 children isn't permitted to gather at school to learn Torah, groups of 10 are otherwise free to gather for any reason whatsoever (*e.g.*, to play poker, watch sports, or throw a cocktail party). Later on October 6, Cuomo signed Executive Order 202.68 (the Order or EO), formalizing the cluster initiative and providing that it "shall be enforced no later than Friday, October 9, 2020, as determined by" local authorities. Ex.1-B at 4. The Order also set a penalty for violations: "$15,000 per day." *Id.* at 2.

The next day, de Blasio announced the Order would be enforced in New York City beginning on October 8. On October 8, a Jewish organization and the Catholic Diocese of Brooklyn sought temporary restraining orders against the worship restrictions, which were denied. *Agudath Israel of Am. v. Cuomo*, No. 20-cv-04834, Minute Entry (E.D.N.Y. Oct. 9, 2020); *Diocese of Brooklyn v. Cuomo*, No. 20-cv-04844, ECF 15

8

(E.D.N.Y. Oct. 9, 2020). Neither decision addressed school closures. *See also Diocese of Brooklyn*, ECF 32 (Oct. 16, 2020) (same, in later decision denying preliminary injunction). And in denying the *Diocese of Brooklyn* TRO, Judge Komittee explained that "the Governor of New York made remarkably clear that this Order was intended to target [Orthodox Jewish] institutions." No. 1:20-cv-04844, ECF 15 at 3.

Over the following weekend—consisting of the important Jewish holidays of Hoshana Rabbah (October 9), Shimini Atzeres (October 10), and Simchas Torah (October 11), City officials "issued 62 tickets and more than $150,000 in fines" under the EO. Ex.1-V at 1. Then, on October 14, the Governor steepened the penalties ordering state funding withheld from any "public or nonpublic school . . . found to have been in violation of" the EO. Ex.1-C. On October 17, Cuomo stated that he intends to continue targeting clusters for shutdowns "until a vaccine is available." Ex.1-Y at 2.

### E. The Order's Impact on BYAM

BYAM is in a red zone. Ex.2-E. But for the Order, BYAM would have reopened after Sukkot on October 13. Because of the Order, BYAM is now indefinitely prohibited from reopening by state law. This indefinite forced closure has had and will have a devastating impact on the religious exercise of BYAM and its staff and families, jeopardizing their ability to pass on their faith and way of life to the next generation through the many aspects of a religious education at BYAM that cannot be replicated through virtual means. Ex.2 ¶¶16, 18-21, 30-31.

BYAM now intends to open on Tuesday, October 27, after COVID-testing all students and staff. *Id.* ¶41. Upon reopening, BYAM intends to continue the successful precautionary measures set out in its approved reopening plan.

### F. COVID-19 and Schools

As Governor Cuomo acknowledged last week, the science shows that COVID-19 is "not being spread by schools." Ex.1-R at 4. And again, Mayor de Blasio has similarly observed that there is "very little coronavirus activity in our schools." Ex.1-P at 2.

Data bears these statements out. Ex.1-T at 2 (Brown University economist recounting study of 200,000 children in 7 states from last two weeks of September, concluding: "Schools do not, in fact, appear to be major spreaders of COVID-19."); *see also* Ex.4-B at 1 ("COVID-19 poses relatively low risks to school-aged children"; "the rate of infection among younger school children, and from students to teachers, has been low, especially if proper precautions are followed").

These statements by Defendants—unlike the Order—correspond with "the public health consensus that the decision to open or not open schools should be focused on the safety profile of the individual school or school system." Ex.4 ¶55. Indeed, the CDC has explained that "transmission significant enough to warrant a blanket school closure order should be accompanied by a farther-reaching, communitywide shelter-in-place order," not "permit[ing] other comparable and even higher risk activities to resume in the same communities . . . where in-person education remains forcibly closed." *Id.* ¶¶57, 58. Allowing child care centers to remain open, for example, but closing schools does not accord with the public health consensus. *See id.* ¶¶59-62.

## LEGAL STANDARD

A court grants preliminary or emergency injunctive relief if the plaintiff shows "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Ventura de Paulino v. NYC Dep't of Educ.*, 959 F.3d 519, 529 (2d Cir. 2020). "[L]ikelihood of success" means "a greater than fifty percent probability of success on the merits." *Citigroup Glob. Mkts, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34-35 (2d Cir. 2010). A constitutional violation, or an allegation of a constitutional violation, satisfies the irreparable harm requirement. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996).

## ARGUMENT

### I.  Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed on the merits of their claims for three independent reasons.[1] First, Defendants' actions interfere with parents' right to direct the religious education and upbringing of their children. *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35 (1925); *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972). This right is "specifically protected by the Free Exercise Clause of the First Amendment," *Yoder*, 406 U.S. at 214, and remains so even after the Supreme Court's decision in *Emp. Div. v. Smith*, 494 U.S. 872, 881-82 (1990). *See Leebaert v. Harrington*, 332 F.3d 134, 144 (2d Cir. 2003).

Second, even under *Smith*, Defendants' actions violate the Free Exercise Clause. Their actions are not "neutral," because Defendants have admittedly "target[ed]" Orthodox Jewish communities and activities with special, more onerous restrictions, *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531-33 (1993). And they are not "generally applicable" because while Defendants have shuttered schools, they treat more favorably other activities that "threaten [their] interest in slowing the spread of COVID-19 to as similar or greater degree," *Soos*, 2020 WL 3488742, at *11.

Laws infringing any of these three doctrines—*Yoder*, neutrality, general applicability—trigger strict scrutiny—a demanding test that Defendants can't satisfy.

### A.  Defendants' actions violate *Yoder*.

Defendants' actions run afoul of the Constitution's protections of religious education. All parents have a constitutional right "to direct the upbringing and education

---

[1] For the same reasons Plaintiffs prevail on likelihood of success, they also prevail under the "serious questions" standard unique to the Second Circuit. A government policy admittedly based on "fear" rather than reason does not qualify as "government action taken in the public interest pursuant to a statutory or regulatory scheme" for purposes of the government exception to the "serious questions" prong. Ex.1-U at 2-3; *Cent. Rabbinical Cong. of U.S. & Can. v. NYC Dep't of Health & Mental Hygiene*, 763 F.3d 183, 192 (2nd Cir. 2014).

of children," *Pierce*, 268 U.S. at 534-35, and that right has long dovetailed with the free exercise rights of religious parents. As the Supreme Court recently observed, "[r]eligious education is vital to many faiths practiced in the United States," and it is of "central importance in Judaism" in particular. *Our Lady*, 140 S. Ct. at 2064-65. Considering these realities—and "the close connection that religious institutions draw between their central purpose and educating the young in the faith," *id.* at 2066—it should be no surprise that even neutral and generally applicable laws that interfere with the ability of institutions and parents to "direct the education of their children" are subject to the most exacting scrutiny. *See Smith*, 494 U.S. at 881.

Indeed, the landmark *Yoder* decision involved just such a scenario. There, the Supreme Court vindicated the right of the Old Order Amish to educate their children in continuous contact with their "community, physically and emotionally, during the crucial and formative adolescent period of life," 406 U.S. at 211—even when that meant noncompliance with Wisconsin's compulsory education laws. Where Amish parents sought to remove their children from school before the age of 16, *id.* at 207, the Court reasoned that any "speculative gain[s]" from an additional year or two of schooling could not "justify the severe interference with religious freedom such additional compulsory attendance would entail." *Id.* at 227.

The Court reached that decision based on traits of the Amish faith shared by Orthodox Judaism—a fact confirmed by the *Yoder* Court's choice of analogies. *See id.* at 210 (Amish adult baptism was "not unlike the Bar Mitzvah of the Jews"); *id.* at 216 ("[T]he Old Order Amish religion pervades . . . their entire way of life, regulating it with the detail of the Talmudic diet"). As with the Amish, for Orthodox Jews their "faith and their mode of life are . . . inseparable and interdependent." *Id.* at 215; *see, e.g.,* Ex.2 ¶¶9, 24; Ex.3 ¶9 (BYAM inculcates *mitzvot* (Jewish religious obligations) and *middot* (positive character traits) into students' daily activities of students so girls will grow into young women faithful to their tradition). As with the Amish,

12

Jewish beliefs are highly reticulated and extend to every sphere of life—so, for example, Bais Yaakov schools have from their inception incorporated faith and morals into every aspect of girls' education to ensure they would grow into virtuous women accustomed to living their faith. And for all these reasons, a Jewish education is crucial to the Orthodox Jewish community's "continued survival." *Yoder*, 406 U.S. at 209; *see* Ex.3 ¶¶6-8. Closing Orthodox Jewish schools, then, is not just a social or economic threat to Orthodox Jews—it is an existential one.

That is why the Jewish tradition has long regarded religious instruction as "an obligation of the highest order," to be entrusted to those who share the faith. *Our Lady*, 140 S. Ct. at 2065. It is why "Orthodox Jews" throughout our own nation's history have "created separate schools" to educate their children. *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2272 (2020) (Alito, J., concurring). And it is why their right to do so enjoys constitutional status and may be "overbalanced" only by "interests of the highest order"—and only when those other, paramount interests cannot be "otherwise served." *Yoder*, 406 U.S. at 215.

## B. Defendants' actions are not neutral.

Defendants' actions are also subject to strict scrutiny because they were motivated by an intent to punish and scapegoat Orthodox Jews. As Judge Komitee has already held, "the Governor of New York made remarkably clear that this Order was intended to target [Orthodox Jewish] institutions." *Diocese of Brooklyn*, No. 1:20-cv-04844 (E.D.N.Y.), ECF 15 at 3. "[T]he government . . . cannot impose regulations that are hostile to the religious beliefs of affected citizens." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018). A law is therefore not neutral if it was "enacted 'because of', not merely 'in spite of', [its] suppression of" a religious activity or group. *Lukumi*, 508 U.S. at 540.

To determine whether a law "improper[ly] attempt[s] to target" religion, courts look first to its text and "effect" in "operation." *Id.* at 534-35. Other relevant factors

13

"include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece*, 138 S. Ct. at 1731 (quoting *Lukumi*, 508 U.S. at 540); *accord New Hope Family Servs., Inc. v. Poole*, 966 F.3d 145, 163 (2d Cir. 2020) (reversing district court under *Masterpiece* and *Lukumi*; "pleadings give rise to a sufficient 'suspicion' of religious animosity").

Here, all these factors show that Defendants' restrictions were enacted based on a "hostility . . . inconsistent with the First Amendment." *Masterpiece*, 138 S. Ct. at 1732. To start, the intent to target Orthodox Jews is apparent from the face of Defendants' actions. On October 1, the Governor identified "20 hotspot ZIP codes" based on positivity rate and positive tests. Exs.1-A, 1-D. That day, however, the City imposed draconian restrictions on schools in only eight of these ZIP codes—corresponding with predominantly Jewish neighborhoods—and *not* on six non-predominantly-Jewish ZIP codes with comparable or higher positivity rates and positive tests. *Id.*, Ex.1-F.

Yet even this targeting didn't suffice for the Governor. Instead, in issuing the EO, he eschewed ZIP codes altogether, instead targeting as "clusters" the predominantly Jewish *areas within* the ZIP codes. Ex.1-H, 1-K; Ex.1-X at 3 (map of Mayor's ZIP codes and Governor's red and orange zones in Brooklyn overlaid on map of Orthodox Jewish synagogues, yeshivas, and businesses). Indeed, the Governor couldn't have been more explicit about this, explaining on October 9 that "we have a couple of unique clusters, frankly, which are more religious organizations, *and that's what we're targeting*." Ex.1-K at 2 (emphasis added); *see also* Ex.1-K at 3 ("[T]he issue is with that ultra-orthodox community.").

To add insult to injury, the Governor also publicly dismissed the concerns of the Orthodox Jewish community, claimed their opposition was being driven by President

Trump, and likened them to white supremacists. The Governor stated, "Look, the president fans division. He does. He always has, started in Charlottesville with KKK there are good people on both sides. No. The KKK is not good. Racism is not good. Discrimination is not good. Kidnapping is not good. Violence is not good. I see it here in New York with the political interference with this ultra-orthodox community that we have on our clusters. I believe that I have evidence that the Trump campaign is fueling their opposition and their divisiveness." *Id.* at 3.

Further, the Governor has falsely and consistently asserted that the Orthodox Jewish community would not work with the State or City to combat COVID-19. For example, at press briefings, the Governor has said, "Also, remember, this is not the first time we've had this discussion with members of this community [the Orthodox Jewish community]. We went through this just recently with the measles vaccine. Same argument. Same argument." Ex.1-J at 4; *see also* Ex.1-M at 4 ("There will be certain populations who don't believe in the vaccine, religious reasons, the anti-vaxxers, and you'll continue to have clusters at least a year."); Ex.1-L at 2 ("There will be people who will not receive the vaccine for one reason for another."). On top of this, the Governor has falsely maintained that he has "had dozens and dozens of conversations" with the "Ultra-Orthodox community" and "they have *never* complied with the rules." Ex.1-N at 5 (emphasis added). He has told the press and public, "[D]on't kid yourself," because "that's what we're running to with [a] lot of these ultra-Orthodox communities, who are also very politically powerful." Ex.1-M at 5.

Typically, courts must infer from circumstances that a law constitutes a strict-scrutiny-triggering "religious gerrymander," because most governments don't have the *chutzpah* to say publicly that they are targeting religious minorities. *Lukumi*, 508 U.S. at 535 (internal quotation marks omitted). Here, however, the Governor—and the government—*admit* the religious gerrymandering. They quite literally red-lined Jewish communities. *See* Ex.1-X.

The Order's targeting of Orthodox Jews is thrown into even sharper relief by the Governor's other "'contemporaneous statements'" in issuing it. *Masterpiece*, 138 S. Ct. at 1731. The Governor announced the "cluster" policy that would become the Order at an October 5 press conference. Ex.1-G. At that press conference, the Governor repeatedly referenced "the Orthodox community," the "Jewish community" and "rabbi[s]." *Id.* at 2, 6, 7, 8, 10. He stated that he was "going to meet with members of the ultra Orthodox community" and tell them "[i]f you're not willing to live with these rules then I'm going to close the synagogues." *Id.* at 8; Ex.1-Z at 2. And he illustrated his claim that "[r]eligious gatherings . . . have been a problem" with photographs of gatherings of members of one (and only one) religion—Orthodox Jews. *See* Ex.1-G at 7. Although the Governor stated that the photographs had been taken "in the recent past," *id.* at 7, one of them had in fact been taken at a funeral in 2006, Ex.1-Q.

Nor was this the first time Defendants singled out Orthodox Jews as to blame for the virus's spread. To the contrary, the "'historical background'" culminating in the EO shows that Defendants have been scapegoating communities like Plaintiffs' from the beginning. *Masterpiece*, 138 S. Ct. at 1731. In April—after personally participating in breaking up an Orthodox funeral—the Mayor delivered a "message to the Jewish community" that "the time for warnings has passed," and that he had "instructed the NYPD to proceed immediately to summons" or "arrest." Ex.1-AA, 1-BB at 1. "In June, the NYPD chased Hasidic families out of Brooklyn parks," Ex.1-CC, even as the Governor and Mayor "applauded and encouraged" "mass protests" against racism and police violence nearby. *Soos*, 2020 WL 3488742, at *11-12. And the Governor issued the EO challenged here on the eve of three critical Jewish holidays—prohibiting these celebrations altogether even though the Governor himself acknowledged that enforcement of *existing* rules would have prevented the identified problem from arising in the first place. Ex.1-G at 6 ("We have rules for all these areas in place now.

Well then how's it increasing? Because people are not following the rules. That's why.").

Given all this, this is a straightforward case of religious targeting. The Governor himself has admitted the Order was "right on the line of government intrusion on religion." Ex.1-DD at 2. And a judge in another District has already concluded that it is "remarkably clear that this Order was intended to target a" particular religious group. *Diocese of Brooklyn*, *supra*. The conclusion that the Order was targeted at the City's Orthodox Jewish communities doesn't necessarily "mean [it] is constitutionally deficient." *Cent. Rabbinical*, 763 F.3d at 198. But it does mean that strict scrutiny must be applied to Defendants. *Id.* at 197-98 (citing *Lukumi*, 508 U.S. at 546).

**C. Defendants' actions are not generally applicable.**

Defendants' actions are also subject to strict scrutiny because they aren't "generally applicable." *Cent. Rabbinical*, 763 F.3d at 197; *see Soos*, 2020 WL 3488742, at *11. When a law burdens religious exercise, "categories of selection are of paramount concern." *Id.* (quoting *Lukumi*, 508 U.S. at 542). Even a neutral law is therefore subject to strict scrutiny if it "regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it"—and thus isn't generally applicable. *Cent. Rabbinical*, 763 F.3d at 197.

This Court's decision in *Soos* is squarely on point. There the Court considered whether Defendants violated the Free Exercise Clause by restricting houses of worship to 25% capacity while "nonessential businesses"—including, for example, "offices, retail stores . . . , and salons"—"were permitted to open at 50%." 2020 WL 3488742 at *11. The Court answered *yes*, explaining that the operation of these secular businesses "threaten[ed] defendants' interest in slowing the spread of COVID-19 to a similar or greater degree" than worship—"trigger[ing] strict scrutiny." *Id.*; *see also, e.g., Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) (strict scrutiny because "exemptions for secular activities pose[d] comparable public health risks to worship

17

services"); *Berean Baptist Church v. Cooper*,, 2020 WL 2514313, at *8 (E.D.N.C. May 16, 2020) (same). *Cf. S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of emergency injunction) (upholding order that treated "*only dissimilar activities*" more leniently than religion (emphasis added)).

The Order here is likewise "underinclusive" with respect to Defendants' claimed interest in slowing the spread, triggering strict scrutiny. *Soos*, 2020 WL 3488742, at *11. The Order shutters schools entirely in red and orange zones. Ex.1-B. Even in red zones, however, the Order imposes no capacity limitations on businesses defined as "essential"—a broad category including, for example, "office-based work" and "higher education research". Ex.1-I at 6. These activities pose at least "comparable public health risks" to in-person religious schooling, *Roberts*, 958 F.3d at 414; indeed, they likely pose more, given the robust data (and Defendants' admissions) that K–12 schools aren't significantly spreading the virus. *See* Ex.1-T (contrasting universities). So Defendants must justify the difference under strict scrutiny.

Most egregiously, "child care services" are defined as "essential," meaning that daycares and day camps can operate even in red zones with no additional restrictions. Ex.1-I at 5-6. But there is no imaginable COVID-19-related rationale for distinguishing between daycare and in-person school. Both involve children gathered for hours with their peers; if anything daycare is far riskier, since "pre-school-aged children cannot be expected to observe social distancing," are often less willing to wear masks, "and require more physical contact (e.g., diaper changes) than school-aged children." Ex.4 ¶60. Yet the Order bars one and leaves the other untouched—"a difference in treatment" that can't "be found compelling." *Soos*, 2020 WL 3488742, at *12.

At bottom, Defendants' distinction between daycare and school reduces to a value judgment: Defendants believe allowing daycare so parents can work is more important than allowing school so children can learn their faith. Defendants' actions

burdening religion on the basis of this "value judgment" "must survive heightened scrutiny." *Fraternal Ord. of Police v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (Alito, J.); *see Lukumi*, 508 U.S. at 537 (government may not "devalue[] religious reasons for [acting] by judging them to be of lesser import than nonreligious reasons").

Finally, the EO isn't generally applicable because, while it shutters schools in red and orange zones, its restrictions on "gatherings" apply only to "*non-essential* gatherings"—indicating there is some category of *essential* gatherings that are wholly permissible. Ex.1-I at 2. Plaintiffs are aware of nothing setting objective standards for what makes a gathering "essential"—a First Amendment problem in itself. *See Lukumi*, 508 U.S. at 537 (system of individualized exemptions triggers strict scrutiny). But given that "Governor Cuomo and Mayor de Blasio" have "sent a clear message" since early in the pandemic "that mass protests are deserving of preferential treatment," the point of this exception is likely to carve out space for Defendants to continue "encourag[ing] participation in protests," however "flagrant[ly]" they "disregard" the rules. *Soos*, 2020 WL 3488742, at *12. As this Court has held, such a "simultaneous pro-protest/anti-religious" position violates the First Amendment. *Id.*

**D. Defendants cannot satisfy strict scrutiny.**

Because Defendants' actions implicate *Yoder* and aren't neutral and generally applicable, Defendants must show they were "narrowly tailored" to advance a "compelling governmental interest." *Lukumi*, 508 U.S. at 531-32; *see Yoder*, 406 U.S. at 215. Defendants can't do so; indeed, they have conceded both elements.

First, to have a compelling interest the government must at least "identify an actual problem in need of solving," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011)—yet here, Defendants have admitted that the virus is "not being spread by schools." Ex.1-R at 4; *accord id.*, Ex.1-P at 2 ("very little coronavirus activity in our schools"). Second, for a law to be narrowly tailored, the burden on the plaintiff's rights must be "actually necessary to the solution." *Brown*, 564 U.S. at 799. Yet here,

Defendants have admitted the opposite: closure of schools by geography is a "blunt policy," not a "tailored" one, Ex.1-U at 21:33-22:21, and the reason for any prior "increas[e]" in cases was "[b]ecause people" allegedly were "not following the rules" "in place" at the time, not because of the need for new rules, Ex.1-G at 6.

Even if the government has more "latitude" in the context of a pandemic, *Soos*, 2020 WL 3488742, at *8 (discussing *Jacobson v. Massachusetts*, 197 U.S. 11 (1905)), no amount of "slack in the leash" could justify Defendants' actions on these facts, *Capitol Hill Baptist Church v. Bowser*, No. 20-cv-02710 (TNM), 2020 WL 5995126, at *7 (D.D.C. Oct. 9, 2020)—requiring preliminary relief.[2]

### 1. Defendants' interest in closing BYAM is not compelling.

The government has a "compelling interest in preventing the spread of" COVID-19. *Roberts*, 958 F.3d at 415. For purposes of strict scrutiny, however, compelling interests aren't assessed "in the abstract" but in the particular "*circumstances of th[e] case.*" *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000). The Court must "look[ ] beyond broadly formulated interests" and "'searchingly examine'" whether Defendants have a compelling interest in taking the *particular action at issue here*— shutting down schools like BYAM. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (quoting *Yoder*, 406 U.S. at 213); *accord Soos*,

---

[2] This Court in *Soos* understood the Supreme Court's denial of an emergency injunction in *South Bay* to "follow[ ] the guidance of *Jacobson*." 2020 WL 3488742 at *8 (citing *S. Bay*, 140 S. Ct. at 1613-14 (Roberts, C.J., concurring)). But Chief Justice Roberts merely concurred; the Court issued no opinion in *South Bay*, so the decision is binding only as to "the precise issues presented," not any rationale. *Mandel v. Bradley*, 432 U.S. 173, 176 (1977) (per curiam). Nor is it clear that *Jacobson* applies to First Amendment claims at all. *See Capitol Hill Baptist*, 2020 WL 5995126, at *7 n.9 (noting *Jacobson* included no First Amendment claims and "a majority of the Court[] may very well have agreed with Justice Alito's suspicion of *Jacobson* and its application to" free exercise claims) (citing *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting)); *see also* Josh Blackman, *What Rights Are "Essential"? The 1st, 2nd, and 14th Amendments in the Time of Pandemic* (Oct. 9, 2020), at 6, https://perma.cc/JS2N-F4LB ("It is a mistake to simply graft *Jacobson* onto the modern framework of constitutional law."). With or without *Jacobson*, courts must intervene when the government's "decisions result in the curtailment of fundamental rights without compelling justification," and here, as in *Soos*, those "limits have been exceeded." 2020 WL 3488742, at *8.

2020 WL 3488742, at *12 (no compelling interest "narrowly tailored *to these specific plaintiffs*" (emphasis added)). Applying that analysis here, the answer is *no*.

First, Defendants have admitted that the virus is "not being spread by schools." Ex.1-R at 4 ("I understand it's a sensitive topic, but that is the truth."); *accord id.*, Ex.1-P at 2. And Defendants are right. Schools in many parts of the country have been open since early August—time enough to discern "an evidence-based picture of" the virus in schools. Ex.1-T at 2 (Brown University economist's analysis of "data on almost 200,000 kids in 47 states"). And the data is in: "Schools do not, in fact, appear to be major spreaders of COVID-19." *Id.* This finding is consistent with that of the CDC. Ex.4-B at 1 ("[T]he rate of infection among younger school children, and from students to teachers, has been low[.]"). Defendants' targeting is therefore "contrary to science." Ex.4 at 16. And as *Yoder* held, the state can't take children "away from their [religious] community, physically and emotionally" merely for the sake of "speculative gain," "however highly we rank" its interests in the abstract—much less for no gain at all. 406 U.S. at 211, 214,  227.

Defendants' elaborations only underscore the lack of a compelling interest. Cuomo has said renewed lockdowns are justified by positivity rates in the "micro-clusters" exceeding 2%, while the statewide goal is 1%. Ex.1-L at 4. Yet as the Governor admitted, the micro-clusters' positivity rates would be "nothing" "[t]o other states"; indeed, the micro-clusters would be a "safe zone" or "cool spot" by nationwide standards. *Id.* at 4-5; *see* Ex.1-W (Johns Hopkins showing national average positivity rate of 5.3% as of October 17). And the 1% goal is "unrealistic" when considered "intellectually"— "absurdly low." Ex.1-L at 5. Plaintiffs don't blame the Governor for wishing the virus would evaporate altogether. But it takes an "interest[] of the highest order" to override First Amendment rights, *Lukumi*, 508 U.S. at 546, and a government official's self-described "emotional[]" fixation on an "absurd[]" and "unrealistic" goal doesn't come close. Ex.1-L at 5. As in other First Amendment contexts, "the government does

not have a compelling interest in each marginal percentage point by which its goals are advanced." *Brown*, 564 U.S. at 803 n.9.

*Holt v. Hobbs*, 574 U.S. 352 (2015), demonstrates as much. There the Court assessed a state's strict-scrutiny showing by reference to the approach taken by the nation as a whole, explaining that when "many" other jurisdictions do not restrict religious exercise in the way challenged, the defendant "must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Id.* at 369. Here, *no other state* closes schools on a trigger of 2% positivity. Instead, most states are focused on offering guidance to *reopen* schools, not contriving self-described "unrealistic" standards to keep them closed indefinitely. Even in California, schools are not made to close unless in a county with a 7-day average positivity rate of 8%—and even then they may seek individualized waivers. *See, e.g.*, *Blueprint for a Safer Economy, County Tier Status, "Can my school open under this blueprint?"* https://perma.cc/SPT9-M4DF.

Finally, any attempt to justify the Order's draconian treatment of schools fails because it treats more favorably many activities that pose greater or comparable risks. A "law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 546-47 (cleaned up). Yet here, while the Order bans in-person schooling entirely, it imposes no restrictions on (for example) "child care services," Ex.1-I at 5-6—though (as both common sense and expertise attest) any risk of spread in schools could only be *amplified* in the daycare setting. *See* Ex.4 ¶60 ("From a public health perspective, there is very little difference . . . between a four-year old learning letters in a daycare facility and a five-year old learning to write her name in kindergarten."). Defendants can't "marshal . . . scientific evidence" to support this distinction, "undermin[ing any] contention that" they have a compelling interest in enforcing the Order's total shutdown of covered schools. *Capitol Hill Baptist*, 2020 WL 5995126, at *8-9.

At bottom, the only interest consistent with Defendants' actions is the one Governor Cuomo "candid[ly]" articulated on October 6—a climate of "fear" in the City, which the Governor thought he needed to appease with a "blunt policy," at least until "the anxiety comes down." Ex.1-U at 21:33-22:21. But "unsubstantiated" "fear[s] . . . are not permissible bases for" overriding fundamental rights, and Defendants "may not avoid" the Constitution's "strictures" "by deferring to the wishes or objections of some fraction of the body politic." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448 (1985). Defendants' strict-scrutiny showing fails on the first prong.

### 2. Defendants' shutdown is not the least restrictive means.

Even assuming Defendants had a compelling interest, the Order isn't "narrowly tailored to advance" it. *Lukumi*, 508 U.S. at 533. A law isn't narrowly tailored if, for example, the government's interests could "be addressed through" enforcement of "existing" restrictions, *McCullen v. Coakley*, 573 U.S. 464, 492 (2014), or if another "less restrictive alternative would serve the Government's purpose," *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000).

Both are true here—as Defendants admit. First, Governor Cuomo has admitted that the "rules . . . in place" for schools *before* the Order would have prevented spread of the virus had they been "enforce[d]." Ex.1-G at 6. Likewise, Governor Cuomo has admitted the existence of an alternative that is (in his words) "more tailored" than the Order: rather than "clos[ing] every school" in a geographic area, the government could "test the schools, and close the ones that have a problem." Ex.1-U at 20:18-20:52. These admissions are dispositive.

They are also unsurprising. Shutting down all schools in a geographical area—regardless of what precautions are being taken within any particular school, and regardless of what level (if any) of positivity among students and staff—is indeed regulation by "hatchet" rather than "scalpel." *Id*. at 19:08-19:32. As "[l]eading public health organizations" including the CDC and the American Academy of Pediatrics,

agree, schools can safely operate without presenting meaningful risks of spreading the virus, provided "appropriate safeguards," "including social distancing, face coverings," "hand hygiene," and "cohorting." Ex.4 ¶¶1-4. These are exactly the kinds of precautions New York already requires, *see* Ex.4-F, and that BYAM has conscientiously observed, pursuant to its reopening plan, Ex.2-D. And as BYAM's experience attests, these measures *work*: returning to in-person instruction at the same time and in the same neighborhood as (according to Defendants) a resurgence of the virus, BYAM has seen zero cases arise through school activities. *See also* Ex.4 ¶ 62 (BYAM's reopening plan, approved by New York State, conforms to public health consensus).

If a school "fail[s] to comply" with the reopening rules, "the Governor is free to" bring proper enforcement actions "for that reason." *Roberts*, 958 F.3d at 414. Or if Defendants have reason to believe the precautions aren't working in a particular area, they can "test the schools, and close the ones that have a problem." Ex.1-U at 20:18-20:52. What they can't do is draw circles around Orthodox Jewish communities and indefinitely shutter the schools inside. Plaintiffs have a likelihood of success.

## II.   The remaining factors favor injunctive relief.

Absent an injunction, Plaintiffs will suffer irreparable harm. Plaintiffs have diligently observed the government's COVID-19 restrictions for months, often at great (but necessary) jeopardy to the transmission of their beliefs to the next generation. Now, a month after reopening—and with *zero* cases transmitted through school activities—Defendants have unjustifiably required BYAM to shut down again. A "loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.'" *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Even mere allegations of constitutional violations suffice. *Jolly*, 76 F.3d at 482. Indefinite restrictions, which could continue "until a vaccine is available," Ex.1-Y at 2, are thus an *a fortiori* case.

Since Plaintiffs are likely to succeed on the merits and are suffering irreparable harm, the Court need not examine balance of hardships or the public interest; it should simply grant relief. *Ventura*, 959 F.3d at 529. Regardless, these factors tip in Plaintiffs' favor. When the government is the defendant, the balance of hardships and public interest "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And when, as here, an injunction would enjoin a likely unconstitutional law, these factors are satisfied, since the "Government does not have an interest in the enforcement of an unconstitutional law." *N.Y. Progress*, 733 F.3d at 488 (quotation marks omitted).

In any event, Defendants' interest in shuttering a well-managed school is minimal. "An injunction . . . does not undercut defendants' interest in controlling the spread of COVID-19, provided that [P]laintiffs abide by social distancing guidance." *Soos*, 2020 WL 3488742, at *12. And "'[a]s for the public interest, treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees.'" *Id.* (quoting *Roberts*, 958 F.3d at 416).

Moreover, BYAM is being extraordinarily safe. It seeks to reopen not immediately but on October 27—a quarantine-length period after the holidays that ended October 11. BYAM intends to test all students and staff beforehand. And BYAM intends to continue taking the precautions outlined in its reopening plan, as it did—successfully—before the actions challenged here. Simply put, it would be safer for these girls to be at BYAM than anyplace else in New York, and the government has no valid interest to deprive them of either BYAM's religious benefits or its safety.

## CONCLUSION

The Court should grant temporary, preliminary, or permanent injunctive relief.

Dated: October 19, 2020                Respectfully submitted,

                                        s/ Eric C. Rassbach
                                        Mark L. Rienzi (admission to be sought)
                                        Eric C. Rassbach (N.D.N.Y. Bar No. 302836)
                                        The Becket Fund for Religious Liberty
                                        1200 New Hampshire Ave. NW
                                         Suite 700
                                        Washington, DC 20036
                                        erassbach@becketlaw.org
                                        Telephone: (202) 955-0095
                                        Facsimile: (202) 955-0090

                                        Josh Blackman (admission to be sought)
                                        Jewish Coalition for Religious Liberty
                                        1303 San Jacinto Street
                                        Houston, TX 77002
                                        Telephone: (202) 294-9003

                                        *Counsel for Plaintiffs*

26